IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY

CASE NO:

CRAIG H. ROBERTS,

        Plaintiff,

vs.

DOUG BENSON,

        Defendant.

_____/

## COMPLAINT

Plaintiff, CRAIG H. ROBERTS, sues the Defendant, DOUG BENSON, and alleges:

1.      This is an action for damages in an amount in excess of the minimum jurisdictional limits of this Court.

2.      Plaintiff is a resident of Palm Beach County, Florida, has suffered an injury in Palm Beach County, Florida and beyond as a consequence of the misconduct complained of herein, and is sui juris.

3.      Defendant is a non-resident of Florida, subject to the jurisdiction of this Court pursuant to the provisions of Florida's Long Arm Statute, F.S. §48.193(1)(a)2.

4.      Jurisdiction is proper in Florida and venue is proper in Palm Beach County, Florida because the tortious actions of the Defendant described herein were intended to and did defame the Plaintiff where the Plaintiff resides in Palm Beach County, elsewhere in Florida and beyond. The Defendant's tortious conduct was intended to and did severely damage Plaintiff's personal

ROBERTS v. BENSON
Complaint
Page 2

and business reputation among Florida residents to whom the Defendant published his defamatory

statements including persons residing in Palm Beach County, Florida.

5.      Under Florida Law, the tort of defamation is committed in the place where the

defamatory statements are published, *Estes v. Rodin*, 259 So.3d 183, 192 (Fla. 3 DCA 2018).

6.      A non-resident Defendant commits a tortious act in Florida by making electronic

communications into the State if the cause of action arises as it does here from those

communications. *Stone Park Partners, LP v. Tall Tower Capital, LLC*, 231 So.3d 548 (Fla. 2 DCA

2017).

7.      A Defendant has purposefully availed himself of a jurisdiction, when, as here, his

tortious conduct was intentional, aimed at the forum, and caused harm in the state. *Estes*, 258 So.3d

at 193.

8.      Minimum contacts with Florida are sufficient to support jurisdiction over the

Defendant because the required criteria have been met: (1) the claims arise out of the Defendant's

defamatory publications in Florida; (2) the Defendant purposely availed himself of the privilege

of conducting activities within the State by targeting Florida residents to receive his defamatory

statements; and (3) the exercise of personal jurisdiction over the Defendant comports with

traditional notions of fair play and substantial justice. *Estes*, 259 So.3d at 192-193.

9.      On or about June 6, 2020, the Defendant published or caused to be published to

approximately 50 individuals an email, an accurate copy of which is attached as Exhibit A and

incorporated herein.

ROBERTS v. BENSON
Complaint
Page 3

10.     On or about June 8, 2020 and June 15, 2020, the Defendant published to one or more additional individuals, an email, accurate copies of which are attached as Exhibit B and Exhibit C, and which are incorporated herein.

11.     Plaintiff is and at all material times was the President/Developer of Bahama Beach Club Holdings Ltd., an 88-condominium unit development situated in the settlement of Treasure Cay, on the Island of Abaco, one of the Islands of the Commonwealth of The Bahamas.

12.     In September 2019, Hurricane Dorian passed directly over Bahama Beach Club as a Category 5 storm, the most intense tropical cyclone on record to strike the Bahamas and the worst natural disaster in the country's history.  The Bahama Beach Club was devastated by the storm.

13.     Plaintiff undertook the enormous task of financing and directing the rebuilding of the development including negotiating with the casualty insurer to maximize the recovery of compensation for the losses sustained in the storm and coordinating reconstruction efforts among the condominium unit owners.

14.     Defendant, a condominium owner in the development, took issue with Plaintiff's efforts and sought to organize opposition to those efforts among other condominium owners by defaming Plaintiff in communications with other owners, many of whom were and are residents of Florida including residents of Palm Beach County, Florida.

15.     As part of Defendant's calculated assault on the reputation of Plaintiff, Defendant included statements in Ex. A, B and C falsely attributing to the development's casualty insurer the position that Plaintiff is a "BAD risk" and "a moral blight on our community."

ROBERTS v. BENSON
Complaint
Page 4

16.     As evidenced by Exhibit D, the statements alleged in the email were not made by or on behalf of the casualty insurer but were a fabrication of the Defendant.

17.     The natural and ordinary meaning of the Defendant's words were defamatory per se in that they were intended to and did impute to the Plaintiff, conduct, characteristics, or a condition incompatible with the exercise of Plaintiff's lawful business, trade, profession or office.

18.     Defendant's statements when considered alone and without innuendo tended to subject the Plaintiff to distrust, ridicule and contempt.

19.     Defendant's statements were published in Florida to at least those individuals identified on Ex. E.

20.     As a direct and proximate consequence of the Defendant's defamatory publications, Plaintiff's reputation, both personal and as a developer/contractor has been seriously injured and Plaintiff has suffered considerable distress and embarrassment.

WHEREFORE, Plaintiff demands judgment against the Defendant for compensatory damages, costs, and such other and further relief as the Court may deem appropriate under the circumstances.  Plaintiff reserves the right to assert a claim for punitive damages upon satisfying the applicable statutory prerequisites.

ROBERTS v. BENSON
Complaint
Page 5

Plaintiff further demands trial by jury.

Dated this _____ 10th _____ day of _____ Nov. _____ 2020.

Jack Scarola
Florida Bar No.: 169440
Attorney E-Mail: jsx@searcylaw.com and
mmccann@searcylaw.com
Primary E-Mail: scarolateam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL 33409
Phone: 561-686-6300
Fax: 561-383-9451
Attorneys for Plaintiff

NOT A CERTIFIED COPY

On Jun 6, 2020, at 1:01 PM, Doug Benson <u>BENSON727@msn.com</u>> wrote:

Hello All,

After receiving Craig's proposal I reached out to Robert Pinder, our insurance manager at Insurance Management to inquire as to whether Insurance Management would insure Phases 1-4 if we selected Mr. Roberts as our contractor.  **Mr. Pinder called and we spoke.  He was very clear, that Insurance Management and its carriers, will not insure Craig Roberts or any of his related companies under any circumstances, and do not want to do business with him, "in any way, shape or form".** **Mr. Pinder views Mr. Roberts as a bad risk and a moral blight on our community.**  As such, as a Board member and fiduciary, I cannot in good conscience present Mr. Robert's proposal to you for consideration.

I look forward to our meeting tonight.

Sincerely,

Doug Benson

BBC President Phases 1-4

Ex. A


EXHIBIT
A

**From:** Doug Benson <benson727@msn.com>
**Date:** June 15, 2020 at 5:04:27 PM EDT
**To:** "Archer-Glasgow, Tara" <TARCHER@higgsjohnson.com>
**Subject: Fw:  Repair of Condominium Units and Garages Bahama Beach Club**


**From:** Douglas Benson <dbenson727@icloud.com>
**Sent:** Monday, June 15, 2020 3:03 PM
**To:** Doug Benson <benson727@msn.com>
**Cc:** srolle@lennoxpaton.com <srolle@lennoxpaton.com>
**Subject:** Re: Repair of Condominium Units and Garages Bahama Beach Club

Hi Tara,

Although I fully intended to wait until the kids left to address this, it is weighing on me, so I
thought I would follow up!

I have identified 6 separate issues in your letter.  The issues I've noted are:

1. Collective vote is improper;
2. I lack authority because no election;
3. Under insured to cover full replacement value;
4. Proposal must include Ernie's issues;
5. Second contractor proposal; and,
6. Asking owners to sign contracts is an abrogation of Board duties.

Now, I recognize there are some sub issues with a few of the issues, but before I spent the time
required to get you up to speed on these issues and what has been done, and before I provide the
voluminous amount of information and documentation that I have provided to all owners,
including Ernie, on these issues, since Ernie apparently didn't provide it to you, I would like to
know what the end goal your client is pursuing besides the stated cease and desist?  It appears as
though Ernie just doesn't want any construction to take place and would rather a storm take out
the rest of the buildings instead of moving forward.

Just so you know, I have personally addressed every issue you have identified with your
client.  Even though we have 44 owners on our side of the Beach Club, I have spent the most
time conversing with your client and have attempted to address each and every concern of your
client.  Some of Ernie's concerns are beyond the scope of the Phase leadership, such as anything
to do with insurance, adjusting the loss or the placement of insurance.  That is all within the
purview of the BBCOA Board of Directors.

Ernie also knows full well that ALL votes have always and only been taken on a Phase by Phase
basis.  This isn't the first vote we have taken since Dorian. In fact, this is at least the fourth vote
we have taken since the hurricane and each vote has been carried out on a Phase by Phase



**EXHIBIT**
B

basis. To say otherwise is not being candid or honest. I have explained on the phone and in writing how I became the President in each Phase to your client several times. I am not sure why he isn't accepting what I have told him, but he has certainly acted like I am the President of his Phase, since I have previously assessed him for roofing repairs (which he paid) and increased his dues Pre-Dorian to establish some reserves (which he has paid). Yet, here I am, an unpaid volunteer having to respond again to counsel. I have also provided the documentation that clearly establishes that the Board of Directors for the BBCOA has the obligation and duty to procure insurance for the buildings in all of the Phases. I also provided the form from Insurance Management, our property and casualty insurer, whereby Mr. Porco could have insured the upgrades in his unit to the fixtures and structure, yet failed to do so. Yet Ernie somehow thinks that I should have known what upgrades he did in his unit and I somehow should have known the value to increase the coverage? He never gave the Phase any notice whatsoever, that he was modifying his unit. How could anyone possibly provide increased insurance coverage without any knowledge that modifications were being made? I had never seen Ernie's unit until I inspected it after the hurricane. Everything to do with insuring the structures and garages or adjusting the loss for the structures and garages has all been carried out by the BBCOA's Board of Directors to the exclusion of the Phase body corporate.

I have made it clear to all owners during the adjustment process that the Board of Directors for the BBCOA was conducting all negotiations with the insurers and that the insurers would not even speak to me directly or provide any documentation, yet you are asking for information from me that is not within my purview to provide, and Ernie know it. I have made it clear to all owners why the second unsolicited proposal from Craig Roberts, who is NOT a General Contractor, was not being presented and would not be presented, as our insurer had cancelled us only a few days before from all of our insurance coverage when they learned that Craig Robert's was involved in Phase 5 of the Bahama Beach Club. Our Insurance Agent informed me that we were being cancelled because they viewed Mr. Roberts as a BAD risk, and a moral blight on our community.

Ernie has also changed his position a couple of times which is another reason I would like to know what he actually wants to accomplish. While I have honestly tried to accommodate his concerns, it seems like when I address one of Ernie's concerns that he manufactures another concern, or resurrects an old one that has already been answered and addressed. We are currently in hurricane season. It is imperative that we get started on the installation of our new metal roofs and windows immediately to secure our buildings in case of a storm. Our buildings are incredibly vulnerable right now with many of them missing the roofs and windows, as there is little if any lateral support. A strong gust of wind can actually bring our buildings down and that would be devastating to our reconstruction efforts. Your requested cease and desist is compromising ALL Phases ability to move forward to secure the buildings and is placing ALL buildings at risk for complete destruction.

We did conclude our vote on the DCK PLAN yesterday, and Ernie's Phase, Phase 3, received 83.3% of the vote in favor of the DCK PLAN. The DCK PLAN also passed in Phase 1 with 100% of the Votes in favor of the DCK PLAN; The DCK PLAN passed Phase 2 with 75% of the owners approving the DCK PLAN, and the DCK PLAN passed in Phase 4 with 87.5% of Votes in favor of moving forward with the DCK PLAN. All Phases have overwhelmingly voted in favor of moving forward with the DCK PLAN. My reading of Chapter 139, The Law of Property and Conveyancing (Condominium) seems to support that once the PLAN or SCHEME is approved by three quarters of each Phase, that "it shall be binding on the body corporate and all unit owners. Back in October when we were obtaining the first vote that was necessary to move forward with rebuilding, we needed 90% of all owners in each Phase to vote in favor of

rebuilding. We were able to obtain that vote. I have some friends in Phase 5 (The other side of the Beach Club) and they were very concerned that the developer (Craig Roberts) was going to try to get the reconstruction contract for Phase 5 and they did not want that to happen (Apparently, they held the same opinion of Mr. Roberts that Insurance Management held). Based on my understanding in reading the Law of Property and Conveyancing (Condominium), I explained to them that we needed the 90% vote to even consider rebuilding. I told them that the mechanism for stopping any unwanted proposal was to have 12 people in agreement, to stop the 75% vote when it came to voting on the PLAN or SCHEME. Phase 5 has 44 units and needed 33 votes to approve any PLAN moving forward. I let the owners know, that in order to stop any PLAN they didn't agree with that they needed less that 75% to approve. In Phase 5 that meant to stop any PLAN from passing they would need 12 votes, and that 12th vote would prevent the 75% approval. Similarly, we have now obtained the vote to move forward with DCK. If Ernie wanted to prevent the PLAN from moving forward, he would have needed 3 other like minded individuals to join him to prevent the 75% approval that we obtained. In the final tally, the Phase exceeded the 75% threshold and Ernie is just being a sore loser.

Finally, another reason I am asking about Ernie's intentions is because in early May when it appeared that we would not be able to come to terms with DCK concerning a turn key proposal, as an emergency back-up, I decided to put together and present a PLAN to the owners to move forward and install the new metal roofs and new hurricane windows and sliders ONLY in an effort to secure the buildings for hurricane season. The thought was we could secure our buildings and regroup on selecting a contractor to finish the project. We had an informational conference call via Zoom to discuss the various roofing and window proposals that I had secured. We had 4 different roofing bids and 3 different window/slider bids. I presented a PLAN to install roofs and windows only to the owners in Mid-May. That PLAN was approved by the owners securing 75% or more of the vote from each Phase. However, in securing the vote, a few owners including Ernie did not vote and expressed concern of not having an all inclusive proposal. So, while we were securing the vote to move forward with roofs and windows, I continued to negotiate with DCK on a turn key PLAN for our Phases. We received the turn key proposal from DCK and then presented it to the owners which has passed as explained. So, hypothetically speaking, even if we abandoned the DCK PLAN that passed yesterday, we would fall back to the PLAN to install roofs and windows, to which your client also objected.

Finally, The Law of Property and Conveyancing also provides that,

**"All acts done in good faith by the Board shall, notwithstanding it be afterwards discovered that there was some defect in the appointment or continuance in office of any member of the Board or some technical irregularity in the Board's proceedings, be as valid as if such member had been duly appointed or had duly continued in office or as if the proceedings were regular**."

I can honestly say, that the hundreds of hours that I have put in working on our proposals to rebuild since October when i started in earnest, that everything I have done has been in good faith to move our project forward. As a unit owner in each of our Phases, I have a shared interest with all homeowners to keep the reconstruction costs down and NOT have to come out of pocket for any repairs, as I would have to do that four times. That is a lot more than I can say about your client. Based on my dealings, I do not think Ernie has been acting in Good Faith. Your letter with all of its misrepresentation of the facts clearly evinces Mr. Porco's bad faith in this regard.

So, if you could please advise what your client is ultimately seeking so we may be able to focus on the relief requested as opposed to going over old business yet again.  I am happy to discuss. Sincerely,

Douglas W. Benson, Sent from my iPad
BBC President Phases 1-4, 6 & 7



From: Doug Benson <benson727@msn.com>
Date: June 15, 2020 at 5:04:27 PM EDT
To: "Archer-Glasgow, Tara" <TARCHER@higgsjohnson.com>
Subject: Fw:  Repair of Condominium Units and Garages Bahama Beach Club


From: Douglas Benson <dbenson727@icloud.com>

Sent: Monday, June 15, 2020 3:03 PM
To: Doug Benson <benson727@msn.com>
Cc: srolle@lennoxpaton.com <srolle@lennoxpaton.com>
Subject: Re: Repair of Condominium Units and Garages Bahama Beach Club


Hi Tara,


Although I fully intended to wait until the kids left to address this, it is
weighing on me, so I thought I would follow up!


I have identified 6 separate issues in your letter.  The issues I've noted
are:


1. Collective vote is improper;

2. I lack authority because no election;

3. Under insured to cover full replacement value;

4. Proposal must include Ernie's issues;

5. Second contractor proposal; and,

6. Asking owners to sign contracts is an abrogation of Board duties.


Now, I recognize there are some sub issues with a few of the issues, but
before I spent the time required to get you up to speed on these issues and
what has been done, and before I provide the voluminous amount of
information and documentation that I have provided to all owners, including
Ernie, on these issues, since Ernie apparently didn't provide it to you, I



**EXHIBIT**

*C*

would like to know what the end goal your client is pursuing besides the stated cease and desist?  It appears as though Ernie just doesn't want any construction to take place and would rather a storm take out the rest of the buildings instead of moving forward.


Just so you know, I have personally addressed every issue you have identified with your client.  Even though we have 44 owners on our side of the Beach Club, I have spent the most time conversing with your client and have attempted to address each and every concern of your client.  Some of Ernie's concerns are beyond the scope of the Phase leadership, such as anything to do with insurance, adjusting the loss or the placement of insurance.  That is all within the purview of the BBCOA Board of Directors. Ernie also knows full well that ALL votes have always and only been taken on a Phase by Phase basis.  This isn't the first vote we have taken since Dorian. In fact, this is at least the fourth vote we have taken since the hurricane and each vote has been carried out on a Phase by Phase basis.  To say otherwise is not being candid or honest.  I have explained on the phone and in writing how I became the President in each Phase to your client several times.  I am not sure why he isn't accepting what I have told him, but he has certainly acted like I am the President of his Phase, since I have previously assessed him for roofing repairs (which he paid) and increased his dues Pre-Dorian to establish some reserves (which he has paid).  Yet, here I am, an unpaid volunteer having to respond again to counsel.  I have also provided the documentation that clearly establishes that the Board of Directors for the BBCOA has the obligation and duty to procure insurance for the buildings in all of the Phases.  I also provided the form from Insurance Management, our property and casualty insurer, whereby Mr. Porco could have insured the upgrades in his unit to the fixtures and structure, yet failed to do so.  Yet Ernie somehow thinks that I should have known what upgrades he did in his unit and I somehow should have known the value to increase the coverage?  He never gave the Phase any notice whatsoever, that he was modifying his unit.  How could anyone possibly provide increased insurance coverage without any knowledge that modifications were being made?  I had never seen Ernie's unit until I inspected it after the hurricane.  Everything to do with insuring the structures and garages or adjusting the loss for the structures and garages has all been carried out by the BBCOA's Board of Directors to the exclusion of the Phase body corporate.


I have made it clear to all owners during the adjustment process that the Board of Directors for the BBCOA was conducting all negotiations with the insurers and that the insurers would not even speak to me directly or provide any documentation, yet you are asking for information from me that is not within my purview to provide, and Ernie know it.  I have made it

clear to all owners why the second unsolicited proposal from Craig Roberts, who is NOT a General Contractor, was not being presented and would not be presented, as our insurer had cancelled us only a few days before from all of our insurance coverage when they learned that Craig Robert's was involved in Phase 5 of the Bahama Beach Club. Our Insurance Agent informed me that we were being cancelled because they viewed Mr. Roberts as a BAD risk, and a moral blight on our community.

Ernie has also changed his position a couple of times which is another reason I would like to know what he actually wants to accomplish. While I have honestly tried to accommodate his concerns, it seems like when I address one of Ernie's concerns that he manufactures another concern, or resurrects an old one that has already been answered and addressed. We are currently in hurricane season. It is imperative that we get started on the installation of our new metal roofs and windows immediately to secure our buildings in case of a storm. Our buildings are incredibly vulnerable right now with many of them missing the roofs and windows, as there is little if any lateral support. A strong gust of wind can actually bring our buildings down and that would be devastating to our reconstruction efforts. Your requested cease and desist is compromising ALL Phases ability to move forward to secure the buildings and is placing ALL buildings at risk for complete destruction.

We did conclude our vote on the DCK PLAN yesterday, and Ernie's Phase, Phase 3, received 83.3% of the vote in favor of the DCK PLAN. The DCK PLAN also passed in Phase 1 with 100% of the Votes in favor of the DCK PLAN; The DCK PLAN passed Phase 2 with 75% of the owners approving the DCK PLAN, and the DCK PLAN passed in Phase 4 with 87.5% of Votes in favor of moving forward with the DCK PLAN. All Phases have overwhelmingly voted in favor of moving forward with the DCK PLAN. My reading of Chapter 139, The Law of Property and Conveyancing (Condominium) seems to support that once the PLAN or SCHEME is approved by three quarters of each Phase, that "it shall be binding on the body corporate and all unit owners. Back in October when we were obtaining the first vote that was necessary to move forward with rebuilding, we needed 90% of all owners in each Phase to vote in favor of rebuilding. We were able to obtain that vote. I have some friends in Phase 5 (The other side of the Beach Club) and they were very concerned that the developer (Craig Roberts) was going to try to get the reconstruction contract for Phase 5 and they did not want that to happen (Apparently,they held the same opinion of Mr. Roberts that Insurance Management held). Based on my understanding in reading the Law of Property and Conveyancing (Condominium), I explained to them that we needed the 90% vote to even consider rebuilding. I told them that the mechanism for stopping any unwanted proposal was to have 12 people in agreement, to stop the 75% vote when it came to voting on

the PLAN or SCHEME.  Phase 5 has 44 units and needed 33 votes to approve any PLAN moving forward.  I let the owners know, that in order to stop any PLAN they didn't agree with that they needed less that 75% to approve.  In Phase 5 that meant to stop any PLAN from passing they would need 12 votes, and that 12th vote would prevent the 75% approval.  Similarly, we have now obtained the vote to move forward with DCK.  If Ernie wanted to prevent the PLAN from moving forward, he would have needed 3 other like minded individuals to join him to prevent the 75% approval that we obtained.  In the final tally, the Phase exceeded the 75% threshold and Ernie is just being a sore loser.

Finally, another reason I am asking about Ernie's intentions is because in early May when it appeared that we would not be able to come to terms with DCK concerning a turn key proposal, as an emergency back-up, I decided to put together and present a PLAN to the owners to move forward and install the new metal roofs and new hurricane windows and sliders ONLY in an effort to secure the buildings for hurricane season.  The thought was we could secure our buildings and regroup on selecting a contractor to finish the project.  We had an informational conference call via Zoom to discuss the various roofing and window proposals that I had secured.  We had 4 different roofing bids and 3 different window/slider bids.  I presented a PLAN to install roofs and windows only to the owners in Mid-May.  That PLAN was approved by the owners securing 75% or more of the vote from each Phase.  However, in securing the vote, a few owners including Ernie did not vote and expressed concern of not having an all inclusive proposal.  So, while we were securing the vote to move forward with roofs and windows, I continued to negotiate with DCK on a turn key PLAN for our Phases.  We received the turn key proposal from DCK and then presented it to the owners which has passed as explained.  So, hypothetically speaking, even if we abandoned the DCK PLAN that passed yesterday, we would fall back to the PLAN to install roofs and windows, to which your client also objected.

Finally, The Law of Property and Conveyancing also provides that,

"All acts done in good faith by the Board shall, notwithstanding it be afterwards discovered that there was some defect in the appointment or continuance in office of any member of the Board or some technical irregularity in the Board's proceedings, be as valid as if such member had been duly appointed or had duly continued in office or as if the proceedings were regular."

I can honestly say, that the hundreds of hours that I have put in working on
our proposals to rebuild since October when i started in earnest,that
everything I have done has been in good faith to move our project forward.
As a unit owner in each of our Phases, I have a shared interest with all
homeowners to keep the reconstruction costs down and NOT have to come out of
pocket for any repairs, as I would have to do that four times.  That is a
lot more than I can say about your client.  Based on my dealings, I do not
think Ernie has been acting in Good Faith.  Your letter with all of its
misrepresentation of the facts clearly evinces Mr. Porco's bad faith in this
regard.


So, if you could please advise what your client is ultimately seeking so we
may be able to focus on the relief requested as opposed to going over old
business yet again.  I am happy to discuss.

Sincerely,


Douglas W. Benson, Sent from my iPad

BBC President Phases 1-4, 6 & 7





ALEXIOU
KNOWLES
COUNSEL & ATTORNEYS

Our Ref: 112993/ETN/mmi

15th September 2020 – Tuesday

BY HAND
BY EMAIL: srolle@lennoxpaton.com

Mrs. Sophia Rolle-Kapousouzoglou
Partner
3 Bayside Executive Park,
West Bay Street & Blake Road,
Nassau, New Providence, Bahamas

Dear Mrs. Kapousouzoglou:

RE: BAHAMA BEACH CLUB LTD. /CRAIG H. ROBERTS

Your letter dated the 19th June 2020 addressed to Messrs. Cedric Saunders and Andrew Saunders of Insurance Management (Bahamas) Limited (IMB) written on behalf of the above, Craig H. Roberts, has been referred to me for reply.

Your letter references an email dated the 8th June 2020 sent by Doug Benson, the President of Phases 1, 2 and 3, Bahama Beach Club (BBC) to the owners of the Units in those phases.

In the email, after advising the Unit Owners that IMB had cancelled their insurance coverage, Mr. Benson went on to add the following:

"Our Insurance Agent informed me that we were being cancelled because they viewed Mr. Roberts as a BAD risk and a moral blight on our community".

Further on in your letter, you advised that Mr. Benson attributed the quote to IMB's Abaco based agent, Mr. Robert Pinder. Your Client has instructed you that the words are defamatory of him and have caused him grave harm and embarrassment. The purpose of your letter, as it relates to IMB, however, is to verify the veracity of the statement made by Mr. Benson and to determine whether there was such a communication and representation made by IMB in relation to terminating the insurance coverage based on its views towards Mr. Roberts.

In order to address your query, I spoke directly with the agent in question, Mr. Robert Pinder, to hear his version of the conversation he had with Mr. Benson in which the offending words were purportedly uttered.

Cont'd.

NOT A CERTIFIED COPY

Ex. D



Our Ref: 112993/ETN/mmi

Page No. 2

Mrs. Sophia Rolle-Kapousouzoglou                    15th September 2020 – Tuesday

     Mr. Pinder advised that it was Mr. Benson who actually made the call to him and not he to Mr. Benson on or around the 4th June 2020 out of concern that IMB had indicated to BBC that it was cancelling all insurance coverages that BBC had with it. Mr. Pinder further stated that he candidly advised Mr. Benson that IMB had taken the position that it would no longer do any further business with BBC if Mr. Roberts was involved and that this decision was taken as a result of the contentious relationship that developed between IMB and Mr. Roberts during the settlement of the Dorian claim. Mr Pinder, however, vehemently denied that he uttered the offending words or words bearing any resemblance to them.

     Mr. Pinder indicated that he was shocked to learn that Mr. Benson had attributed the utterance of the offending words to him and that he only discovered this when he was presented with a copy of Mr. Benson's email to the Unit Owners.

     In the above circumstances, IMB denies that their agent, Mr. Robert Pinder, uttered the offending words to Mr. Benson and the words published by Mr. Benson in his email were his own.

Your sincerely,
ALEXIOU, KNOWLES

E. Terry North

| | NAME OF RECEPIENT | EMAIL ADDRESS | DATE RECEIVED |
|---|---|---|---|
| 1. | Craig H. Roberts 2720 Biarritz Drive Palm Beach Gardens, FL 33410 | ████@██████████████ | 8th June, 2020; 14th September, 2020 |
| 2. | Dean Arnold 1100 Commercial Blvd. #118 Naples, Fl 34104 | ████████@████████████ | 8th June, 2020; 14th September, 2020 |
| 3. | Brenda Moreira 8600 SW 52 Ave. Miami, FL 33143 | ██████████@█████ | 8th June, 2020; 14th September, 2020 |
| 4. | Jimmy Griffin 1081 SW Pine Tree Lane Palm City, FL 34990 | ███████████████@██████ | 8th June, 2020; 14th September, 2020 |
| 5. | Dan McAlpin 22 Palmetto Drive Stuart, FL 34996 | ███████@██████ | 8th June, 2020; 14th September, 2020 |
| 6. | David Strube 5 Oakdale St. Windermere, Fl 34786 | █████@██████ | 8th June, 2020; 14th September, 2020 |
| 7. | Denise Strube 5 Oakdale St. Windermere, Fl 34786 | ███████@██████ | 8th June, 2020; 14th September, 2020 |
| 8. | Ernie Porco Has now moved to CT. | █████████@██████ | 8th June, 2020; 14th September, 2020 |
| 9. | John Cash 651 Okeechobee Blvd. Apt. 904 West Palm Beach, FL 33401 | ████@██████████████ | 8th June, 2020; 14th September, 2020 **BAHAMIAN CITIZEN** |
| 10. | Dennis Carvajal 5011 Alhambra Circle Coral Gables, FL 33146 | ██████@███████████ | 8th June, 2020; 14th September, 2020 |
| 11. | Steve Moynihan 19686 Loxahatchee River Road Jupiter, FL 33458 | █████████@██████ | 8th June, 2020; 14th September, 2020 |
| 12. | Faith Moynihan 19686 Loxahatchee River Road Jupiter, FL 33458 | ██████████████@██████ | 8th June, 2020; 14th September, 2020 |
| 13. | Maggie Miranda 1024 Palermo Ave. Coral Gables, FL 33134 | ██████████@██████████ | 8th June, 2020; 14th September, 2020 |
| 14. | Jose Miranda 1024 Palermo Ave. Coral Gables, FL 33134 | █████@██████████ | 8th June, 2020; 14th September, 2020 |
| 15. | Julio Fuentes 8970 SW 85TH Terrace Miami FL 33173 | ███████████@███████████ | 8th June, 2020; 14th September, 2020 |
| 16. | Frank Del Rio 8788 SW 8th Street Miami, FL 33174 | ██████████@██████ | 8th June, 2020; 14th September, 2020 |
| 17. | Susan Hooper | █████████████@██████ | 8th June, 2020; 14th |

Ex. E

3508 Dorksly Drive
Melbourne, FL 32940

| | | | |
|---|---|---|---|
| 18. | Nestor Machado<br>7401 Vistamar Street<br>Coral Gables, FL<br>33143 | ███@███████ | 8th June, 2020; 14th<br>September, 2020 |
| 19. | Sandy Acres<br>415 15th Ave. South<br>Naples, FL 34102 | ███████@█████ | 8th June, 2020; 14th<br>September, 2020 |
| 20. | Monique Dilling<br>229 Brittany Avenue<br>Port Orange, FL 32127 | ████████@██████ | 14th September 2020 |



NOT A CERTIFIED COPY